UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RYAN K. GOSSE and CLYDE W. DAVIES,
individually, and as representatives of a
Class of Participants and Beneficiaries of the
Dover Corporation Retirement Savings Plan,

        Plaintiff,

        v.

DOVER CORPORATION,

        and

COMPENSATION COMMITTEEE OF
THE BOARD OF DIRECTORS OF DOVER
CORPORATION, KRISTIANE C. GRAHAM,
MICHAEL F. JOHNSTON, KEITH E.
WANDELL, MARY A. WINSTON,

        and

DOVER CORPORATION BENEFITS
COMMITTEE, DANIEL J. CURCIO

        Defendants

Case No: 1:22-cv-4254

CLASS ACTION AMENDED
COMPLAINT FOR CLAIMS
UNDER 29 U.S.C. § 1132(a)(2)

COMES NOW Plaintiffs, Ryan K. Gosse and Clyde W. Davies, individually and as representatives of a Class of Participants and Beneficiaries of the Dover Corporation Retirement Savings Plan (the "Plan" or "Dover Plan"), by their counsel, WAL-CHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and asserts to

the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

__INTRODUCTION__

1. Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2. The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3. The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015)).

4. Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530). "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable

time," fiduciaries "breach their duty [of prudence]." *Id.* Imprudent investments, as that term is used herein and by the United States Supreme Court, includes services provided by Plan recordkeepers. *See Hughes*, 142 S. Ct. at 742.

5.     Defendants, Dover Corporation ("Dover"), the Compensation Committee of the Board of Directors of Dover Corporation, including individual defendants Kristiane C. Graham, Michael F. Johnston, Keith E. Wandell, and Mary A. Winston, ("Compensation Committee Defendants"), and the Dover Corporation Benefits Committee, including individual member Daniel J. Curcio ("Benefits Committee Defendants") (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary oversight, authority, or control over the 401(k) defined contribution pension plan – known as the Dover Corporation Retirement Savings Plan (the "Plan" or "Dover Plan") – that it sponsors and provides to its employees.

6.     During the putative Class Period (August 11, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative (RKA)] fees" *Hughes,*142 S. Ct. at 739-740, and by failing to timely remove their high-cost recordkeepers, Wells Fargo Bank N.A. ("Wells Fargo") (at least from 2009 – through September 2020)[1] and Bank of America, N.A. d/b/a Merrill ("Merrill") (September 2020-present).

---

[1] Although the Class Period runs from August 11, 2016 to the present, the Plan's publicly-filed 5500 forms indicate that Wells Fargo was the Plan recordkeeper going back to at least 2009, and thus was the Dover Plan recordkeeper for more than eleven years before being replaced by Merrill in September 2020.

7. These objectively unreasonable RKA fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8. Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive RKA fees. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan RKA services.

9. ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

10. There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

11. The unreasonable RKA fees paid inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

12. These breaches of fiduciary duty caused Plaintiffs and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

13. To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29

U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of the duty of prudence.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

15. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

16. Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

17. In conformity with 29 U.S.C. § 1132(h), Plaintiffs served the initial Complaint on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

18. Plaintiff, Ryan K. Gosse, is a resident of the State of Minnesota and currently resides in Red Wing, Minnesota, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

19. Plaintiff Gosse started on June 7, 2021 as an Assembly Technician at Central Research Laboratories (CRL), a wholly-owned subsidiary of Dover Corporation, located at 3965 Pepin Avenue, Red Wing MN 55066. He is still currently employed at CRL.

20. Plaintiff Gosse is a current Participant of the Plan and paid excessive RKA fees during the Class Period. During his participation in the Plan, Plaintiff Gosse held investments in the Dover Stock Fund Account, Vanguard Target Retirement 2050 Trust I, and Vanguard Target Retirement 2050.

21. Plaintiff, Clyde W. Davies, is a resident of the State of Ohio and currently resides in Hamilton, OH, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

22. Plaintiff Davies started at OPW, a subsidiary of Dover, in September 2005 and worked as a Computerized Numerical Control (CNC) machinist in Lebanon, OH until June 2021. He then moved to the OPW location in Hamilton, OH, and still is employed there as a CNC Machinist to the present. OPW is located at 9393 Princeton Glendale Road, Hamilton, OH 45011.

23. Plaintiff Davies is a current Participant of the Plan and paid excessive RKA fees during the entire Class Period. During his participation in the Plan, Plaintiff Davies held investments in the Dover Stock Fund Account, Vanguard Institutional Index 500, Dover Stable Value Fund, GQG Partners International Equity Class C Fund, Vanguard Small Cap Institutional Index Fund, and Vanguard Target Retirement 2030 Fund.

24. Plaintiffs have Article III standing as a current Plan participants to bring this action on behalf of the Plan because they suffered actual injuries to their own Plan account through paying excessive RKA fees to Wells Fargo and Merrill during the Class Period, that injury is fairly traceable to Defendants' unlawful conduct

in maintaining Wells Fargo and Merrill as its recordkeepers during the Class Period, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiffs and Class.

25. Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

26. The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA fees) necessary to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

27. Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

28. Dover Corporation ("Dover") is a diversified global manufacturer with annual revenue of approximately $8 billion dollars, delivering equipment and components, consumable supplies, aftermarket parts, software and digital solutions, and support services. It has 50 subsidiaries (including Central Research Laboratories and OPW where Plaintiffs work), 25,000 employees, and is headquartered in Downers Grove, Illinois, at 3005 Highland Park, Downers Grove, IL 60515. In this Amended

Complaint, "Dover" refers to the named Defendants and all parent, subsidiaries, related, predecessor, and successor entities to which these allegations pertain.

29. Dover acted through its officers, including through the individual members of the Compensation Committee of its Board of Directors ("Compensation Committee Defendants"), and through its Benefits Committee and its members ("Benefits Committee Defendants"), to perform Plan-related fiduciary functions in the course and scope of their business. Dover and its Compensation Committee appointed Plan fiduciaries to the Benefits Committee, had a duty to oversee those appointees according to its Charter, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Dover and its Compensation Committee and its members are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

30. The Plan Administrator is the Benefits Committee. As the Plan Administrator, Benefits Committee Defendants are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Benefits Committee Defendants have exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

31. To the extent that there are additional officers and employees of Dover who are or were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers or consultants for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve

the right, once their identities are ascertained, to seek leave to join them to the instant action.

32. The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Dover's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

33. In 2020, the Plan had about $1,579,211,182 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Wells Fargo and Merrill, to ensure that they remained the prudent and objectively reasonable choices as Plan service providers.

34. With 18,331 participants in 2020, the Plan had more participants than 99.91% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $1,579,211,182 in assets in 2020, the Plan had more assets than 99.88% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year.

<u>ERISA'S FIDUCIARY STANDARDS IN THE<br>DEFINED CONTRIBUTION INDUSTRY</u>

35. Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an

individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

36. Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

37. Although Dover contributed employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping or managed account fees or other types of Plan expenses.

38. While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are a significant factor that affect plan participant's investment returns and impact their retirement income.

39. According to the United States Department of Labor, Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices. *See* United States Department of Labor, Employee Benefit Security Administration, *Meeting Your Fiduciary Responsibilities*, 12 at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf (last visited Aug. 11,

2022) (hereinafter "DOL Fiduciary Publication") ("If you are hiring third-party service providers, have you looked at a number of providers, given each potential provider the same information, and considered whether the fees are reasonable for the services provided?").

**Recordkeeping Services**

40.     Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with same level and caliber of services. Wells Fargo and Merrill are two such recordkeepers.

41.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard bundled offerings of the same level and quality as other recordkeepers who service mega plans.

42.     The fees charged by recordkeepers for RKA services are impacted by 1) the costs of providing the RKA services; 2) the competitive environment related to what other recordkeepers would charge to provide materially identical services; and 3) the revenues that a recordkeeper can generate from both the recordkeeping fees as well as other ancillary revenue based on the potential to manage proprietary investment options in the plan.

43. Recordkeepers determine their willingness to accept fees for providing RKA services based on an evaluation of the potential profitability of a retirement plan services relationship.

44. Providing RKA services involves both fixed and variable costs. The more participants in a plan, the greater proportion of the costs are variable costs which, in turn, means the closer the average cost per participant approaches the variable cost per participant.

45. All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide identical RKA services to maintain the same profit margin rate.

46. As a result, it is axiomatic in the retirement plan services industry that the more participants in a plan, the lower the effective RKA fee per participant the plan can negotiate. All prudent plan fiduciaries and their consultants and advisors are aware of this industry dynamic.

47. There are two types of essential RKA services provided by all record-keepers. The first type, "Bundled RKA" services, include:

    a.      Recordkeeping;

    b.      Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

    c.      Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

    d.      Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the

preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e. Maintenance of an employer stock fund;

f. Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g. Plan consulting services including assistance in selecting the investments offered to participants;

h. Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

k. Trustee / custodian services.

48. The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "A La Carte RKA" services typically include the following:

a. Loan processing;

b. Brokerage services/account maintenance;

c. Distribution services; and

d. Processing of Qualified Domestic Relations Orders (QDROs).

49. The sum of the total Bundled RKA fees plus the total A La Carte RKA fees equals the total RKA fees.

50. As the retirement plan services industry evolved over the past forty-plus years, the recordkeepers have developed automated or semi-automated processes for providing the RKA services.

51. In practice, there are no material difference between the services that are offered and provided by national recordkeepers. Rather, some recordkeepers may differ in *how* they deliver the services.

52. As an example, because the RKA offering are materially identical among all recordkeepers who provide services to large plans, like the Dover plan, it is the standard and prevailing practice for retirement plan consultants and advisors (experts in the retirement plan industry) to request quotes by asking what the recordkeeper's revenue requirement is on a per participant basis for providing the Bundled RKA services.

53. Similarly, in most cases differences in fee rates for the A La Carte services are immaterial in determining the total fees charged by recordkeepers. To the extent that some recordkeepers have charged higher fees for these services, when those recordkeepers are in a competitive situation (in which they may not win the business), they will reduce their A La Carte fee rates to be competitive with what others are charging.

54. The same is true for the Bundled RKA fee rates charged by recordkeepers. Retirement plan consultant and advisors primarily use the Bundled RKA fee rate

of different recordkeepers to make fee rate comparisons and determine whether the Bundled RKA fee rate is reasonable.

55. This approach is validated by the structure of the request for proposals ("RFPs") sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

56. For mega plans, like the Dover Plan, any immaterial variations in the way certain services are received by one plan compared to another plan have an immaterial impact on the reasonable market rate for Bundled RKA services.

57. As a result, comparisons of the fees paid by similar sized plans are meaningful and provide a reasonable basis for determining whether an inference of imprudence is warranted based on the RKA fees being paid by any specific plan.

58. Additionally, any minor variation in the level and quality of Bundled RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

59. Since well before 2015, industry experts have maintained that for mega retirement plans like the Dover Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers:*

*Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

60. Industry experts know that recordkeeping services have become a commodity for retirement plan fiduciaries; virtually every major recordkeeper provide the same core services. See, e.g., Allen Steinberg, *Unchecked Revenue: Show Me the Fees*, https://blog.retireaware.com/2018/01/12/unchecked-revenue/ (last visited Sep. 15, 2022); Fred Barstein, Investment News, *Potential Pru Retirement Sale a Cautionary Tale of a 401(k) Innovator*, https://www.investmentnews.com/prudential-retirement-sale-cautionary-tale-innovatio-205453 (Apr. 20, 2021) ("It is no wonder, but certainly disappointing, that one of the industry's most innovative providers, Prudential Retirement, is reportedly exploring a sale. That highlights how much record keeping has become a commodity focused on scale and costs.").

61. Fidelity, the largest 401k recordkeeper in the country, has conceded that the RKA services that it provides to mega Plans are commodified, including to its own Plan for its own employees.

62. As part of stipulated facts in a similar fees case, Fidelity stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. *Had the Plan been a third-party plan that negotiated a fixed*

*fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present)."* See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

63. All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, like Fidelity, which are treated by the recordkeepers as immaterial because they are inconsequential from a cost perspective to the delivery of the Bundled RKA services.

64. Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

65. Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

66. Plan fiduciaries request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan.

67. The Dover Plan had a standard level of Bundled RKA services, providing recordkeeping and administrative services of a nearly identical level and quality to other recordkeepers who also serviced mega plans during the Class Period.

68. There is nothing disclosed in the Participant section 404(a)(5) fee and service disclosure documents that suggests that the annual administrative fee charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

69. The 2022 Dover Corporation Retirement Savings Plan Participant Disclosure of Plan and Investment Related Information states in pertinent part that "Plan administrative services include recordkeeping services (keeping track of participant accounts and transactions) and trustee/custodial services associated with the safekeeping of assets. Administrative services also include providing participants services such as call centers, websites, account statements and educational materials related to saving and investing for retirement." *Id.* at 3. These are materially identical services provided by other recordkeepers who service mega plans like the Dover Plan.

70. The 2022 Participant Disclosures continues by stating that "[a] quarterly fee of .0225% of participant assets is charged in the beginning of the month following quarter-end to all participants based upon balance at calendar quarter-end. This fee is used to pay plan administrative expenses." *Id.*

71. The quarterly rate of .0225% works out to .09% (9bps) on an annual basis. Adding up all the Plan recordkeeping and administrative (RKA) services that can be allocated to Plan participants, not just the recordkeeping fee – which also includes Willis Towers Watson (advisor/consultant), Insero & Company (Auditor/Accounting), and Alight - amounts to approximately 9bps, which validates that these

Plan fees are all being allocated to and paid by Plan participants in addition to the "annual recordkeeping fee."

72. By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the Dover Plan. Reasonable record-keeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

73. The investment options selected by plan fiduciaries often also have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

74. The 2022 Dover Participant disclosure states in this vein that "[t]he Plan's service provider may receive investment-related revenue from one or more of the Plan's investments, which may or may not be used to offset all or part of the Annual Recordkeeping Fee." *Id.* at 3.

75. Collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund is known as "revenue sharing" or "indirect compensation." The Dover Plan paid its Plan services providers both direct and indirect compensation.

76. The amount of compensation paid to Plan service providers must be *reasonable* (not the cheapest or the average in the market).

77. Reasonable, in turn, depends on contextually understanding the market for such RKA services at the time that the recordkeeping contract is entered into. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

## THE PLAN

78. During the entire Class Period, the Plan received recordkeeping services from Wells Fargo and Merrill.

79. The fees were also excessive relative to the level and quality of RKA services received since the same level and quality of services are provided to all mega plans, like the Dover Plan, any minor variation with respect to the use of components of the standard offering 1) do not impact the Bundled RKA fee rates; and 2) are virtually always immaterial as it relates to the Total RKA fee rates and cannot reasonable explain the disparity between what the Plan paid and the market rate for the services received.

80. This is true regardless of the specific service codes listed by the plan on the Form 5500. *See* Droblyen, *supra*; Steinberg, *supra*; Barstein, *supra*. For example, all recordkeepers provide communications to plan participants but neither Wells Fargo nor Merrill list service code "38 Participant communication" in the Plan's Form 5500.

81. These excessive Plan RKA fees led to lower net returns than the rates enjoyed by participants in comparable 401(k) plans.

82. During the Class Period, Defendants breached their duty of prudence to the Plan, to Plaintiffs, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for RKA services.

83.     Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiffs and members of the Class millions of dollars of harm to their Plan accounts.

### STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

84.     Prudent plan fiduciaries ensure they are paying only reasonable fees for RKA by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Once you have a clear idea of your requirements, you are ready to begin receiving estimates from prospective providers. Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

85.     Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of RKA fees is reasonable in light of the level and quality of RKA services. It is not a cumbersome or expensive process.

86. It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

87. Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

88. A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated RKA fees. To receive a truly "reasonable" RKA fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

89. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

90. First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

91. Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

92. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

93. Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market.

### PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING/RKA FEES AND THE PLAN PAID UNREASONABLE FEES

94. A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

95. During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RK&A fees paid to recordkeepers, including but not limited to Wells Fargo and Merrill.

96. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Wells Fargo and Merrill, in order to avoid paying unreasonable Bundled RK&A fees.

97. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable RKA fees it paid to Wells Fargo and Merrill, and in light of the level and quality of RKA services it received.

98. As set forth in the table below, from the years 2016 through 2020, based upon information provided by the Plan fiduciaries to Plan participants in the Dover participant fee disclosures, the Plan paid an effective average annual Bundled RKA fee of $86 per participant, based on approximately 9 annual basis points (2.25 basis points quarterly) in the fee disclosure. These amounts are calculated using the Plan's Form 5500 filings and indicate the total RKA fees (the sum of the Bundled RKA fees and the A La Carte RKA fees).[1]

---

[1] "Est. RKA Fees" on the chart below are taken directly from the audited Financial Statements attached to the Dover Plan Form 5500s. The amounts are recorded as "Administrative Expenses" on the Statements of Changes in Net Assets Available for Benefits which are audited by Insero & Co., an independent registered public accounting firm.

**Recordkeeping and Administration (RKA) Fees**

| | 2016 | 2017 | 2018 | 2019 | 2020 | *Average* |
|---|---|---|---|---|---|---|
| **Participants** | 19,327 | 19,758 | 18,373 | 18,841 | 18,331 | *18,926* |
| **Est. RKA Fees** | $1,744,477 | $1,986,668 | $1,809,090 | $1,437,305 | $1,138,063 | *$1,623,121* |
| **Est. RKA Per Participant** | $90 | $101 | $98 | $76 | $62 | *$86* |

99. The table below illustrates the annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RKA fees paid by the Plan (as identified in the table above).

**Comparable Plans' RKA Fees Based on Publicly Available Information from Form 5500**
(Price Calculations are based on 2018 Form 5500 or most recent if 2018 not available)

| Plan | Partici-pants | Assets | RKA Fee | RKA Fee /pp | Record-keeper | Graph Color |
|---|---|---|---|---|---|---|
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Viacom 401(K) Plan | 12,196 | $1,249,874,734 | $376,314 | $31 | Great-West | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| Michelin Retirement Account Plan | 13,798 | $616,026,001 | $425,270 | $31 | Vanguard | White |
| Dollar General Corp 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $635,857 | $39 | Voya | White |
| Michelin 401(K) Savings Plan | 16,521 | $2,380,269,826 | $570,186 | $35 | Vanguard | White |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $486,029 | $26 | Great-West | White |

| | | | | | Wells Fargo | Red |
|---|---|---|---|---|---|---|
| **Dover Plan Average Fee** | **18,926** | **$1,371,831,095** | **$1,623,121** | **$86** | | |
| JBS 401(K) Savings Plan | 19,420 | $374,330,167 | $481,539 | $25 | Great-West | White |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price | White |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $1,040,153 | $33 | Alight | White |
| The Savings And Investment Plan | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard | White |

100.    From the years 2016 through 2020, the graph below illustrates the annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average RKA fees paid by the Plan (as identified in the table above), with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



101. From the years 2016 to 2020, the table and graph above illustrate that the Plan paid an effective average annual RKA fee of at least $86 per participant.

102. The more participants a plan has, the lower the effective fee per participant that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the Bundled RKA services.

103. When a plan fiduciary follows prudent practices as outlined by the Department of Labor, and solicits bids from several recordkeepers in a competitive environment, some initial bids for the Bundled RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to negotiate a Bundled RKA fee lower than the trend line such that the total RKA fee would be proximate to the trend line.

104. From the years 2016 through 2020, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual RKA fee of around $32 per participant, if not lower.

105. From the years 2016 through 2020, and as compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting with prudence, the Plan actually would have paid significantly less than an average of approximately $1,623,121 per year in RKA fees, which equated to an effective average of approximately $86 per participant per year.

106. From the years 2016 through 2020, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar

level and quality of services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for RKA of approximately $605,632 per year in fees, which equates to approximately $32 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *almost three times* what they could otherwise pay for RKA services.

107. From the years 2016 through 2020, the Plan additionally cost its participants on average approximately $1,017,489 per year in RKA fees, which equates to on average approximately $54 per participant per year.

108. From the years 2016 to 2020, and because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $5,087,443 in unreasonable and excessive RKA fees.

109. From the years 2016 to 2020, because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $7,497,641 in recordkeeping/RKA fees.

110. Defendants could have received RKA services during the Class Period of the same level and quality from Wells Fargo and Merrill or other recordkeepers that provide recordkeeping services to mega plans, like the Dover plan, because both

the Plan 5500 forms and Plan fee disclosures to participants establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above. There is no evidence, based on these Plan documents, that the plan received any additional services.

111. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, reasonable tradeoffs did not exist between recordkeepers providing a different level or quality of services.

112. Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Wells Fargo or Merrill, and Defendants could have obtained the same Bundled RK&A services for less.

113. Plaintiffs paid these excessive Bundled RK&A fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result of paying these excessive fees.

114. Plaintiffs have participated in several 401(k) plans from other employers and there have been no material differences in the services that they has received.

115. Plaintiffs do not need to provide examples of similar plans receiving the <u>same</u> services in the <u>same</u> year where the primary drivers of price in large plans are the number of accounts and whether the plan's fiduciaries solicited competitive bids, rather than the marginal cost of recordkeeping for each participant. *See Coyer*

*et al. v. Univar Solutions USA Inc. et al.*, 2022 WL 4534791, at \*5 (N.D. Ill. Sept. 28, 2022) (emphasis in original).

116. "The fact that each of the other similarly-sized plans were receiving <u>at least</u> the same services for less provides the kind of circumstantial evidence sufficient to create an inference of imprudence." *Id.* (citing *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 332 (3d Cir. 2019)) (emphasis in original).

117. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Wells Fargo or Merrill vis-à-vis the fees that other RKA providers would charge, and would have accepted, for the same level and quality of services.

118. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's Bundled RKA fees it paid to Wells Fargo and Merrill, but Defendants either simply failed to do so, or did so ineffectively, given that it paid *three times* the Bundled RKA fees than it should have.

119. During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Wells Fargo and Merrill, it would have realized that the Plan was compensating Wells Fargo and Merrill unreasonably and inappropriately for its size

and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and Plan participants, and therefore should have removed Wells Fargo and Merrill as Plan recordkeepers.

120. The Plan RKA fees were also excessive relative to the RKA services received under the 2022 Dover Participant Fee Disclosure, since the quality and level of such services are standard for mega 401(k) and 403(b) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in recordkeeping fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

121. The market for Bundled RKA services for mega plans, like the Dover Plan, is such that all national recordkeepers can provide all the required services that a mega plan might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for Bundled RKA services and what he reasonable fair market fee was for identical services.

122. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Bundled RKA fees than they should have been and/or by failing to take effective remedial actions including removing Wells Fargo and Merrill as the Plan recordkeepers, Defendants breached their fiduciary duty of prudence to Plaintiffs and Plan participants, causing millions of dollars of harm to Plaintiffs and Class Member's retirement accounts.

## CLASS ACTION ALLEGATIONS

123. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

124. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Dover Corporation Savings Retirement Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning August 11, 2016 and running through the date of judgment.

125. The Class includes over 18,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

126. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b. Whether Defendants breached their fiduciary duties to the Plan;

c. What are the losses to the Plan resulting from each breach of fiduciary duty; and

d. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

127. Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were Participants during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

128. Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were Participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

129. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

130. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

131. Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

132. The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against**
**Benefits Committee Defendants – RKA Fees)**

133. Plaintiffs restate the above allegations as if fully set forth herein.

134. Benefits Committee Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

135. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Benefits Committee Defendants in their administration of the Plan.

136. Benefits Committee Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable RKA fees.

137. During the Class Period, Benefits Committee Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

138. During the Class Period, Benefits Committee Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

139. During the Class Period, Benefits Committee Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeepers to make sure they were providing the RKA services at reasonable costs, given the highly competitive market surrounding RKA services and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeepers if they provided RKA services at objectively unreasonable costs.

140. During the Class Period, Benefits Committee Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeepers critically or objectively in comparison to other recordkeeper options.

141. Through these actions and omissions, Benefits Committee Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

142. Benefits Committee Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar

with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

143. As a result of Benefits Committee Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

144. Benefits Committee Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Dover Plan the losses resulting from the breaches, to restore to the Plan any profits Benefits Committee Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Benefits Committee Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

<u>SECOND CLAIM FOR RELIEF</u>
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiffs, on behalf of themselves and Class, Against Defendants Dover and
<u>Compensation Committee Defendants – RKA Fees)</u>**

145. Plaintiffs restate the above allegations as if fully set forth herein.

146. Defendants Dover and Compensation Committee Defendants had the authority to appoint, oversee, and remove members or individuals responsible for Plan RKA fees on the Benefits Committee based on their Charter and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

147. In light of this authority, Defendants Dover and Compensation Committee Defendants had a duty to monitor those individuals responsible for Plan RKA fees

on the Benefits Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

148. Defendants Dover and Compensation Committee Defendants had a duty to ensure that the individuals responsible for RKA services on the Benefits Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants Dover and Compensation Committee Defendants.

149. The objectively unreasonable and excessive RKA fees paid by the Plan inferentially suggest that Defendants Dover and Compensation Committee Defendants breached their duty to monitor by, among other things:

    a. Failing to monitor and evaluate the performance of individuals responsible for Plan RKA fees on the Benefits Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably RKA expenses;

    b. Failing to monitor the process by which the Plan's recordkeepers, Wells Fargo and Merrill, were evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c. Failing to remove individuals responsible for Plan RKA fees on the Benefits Committee whose performance was inadequate in that these individuals continued to pay the same RKA fees even though solicitation of competitive bids would have shown that maintaining Wells Fargo or Merrill as the recordkeepers at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiffs and Plan participants' retirement savings.

150. As the consequences of the foregoing breaches of the duty to monitor for RKA fees, the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

151. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants Dover and Compensation Committee Defendants are liable to restore to the Dover Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RKA fees on the Benefits Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration the Defendants are Plan fiduciaries and have breached their fiduciary duties under ERISA;

D.  An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable RKA fees, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.  An Order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Defendants as necessary to effectuate relief, and to prevent Defendants' unjust enrichment;

F.  An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.  An award of pre-judgment interest;

I.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.  Such other and further relief as the Court deems equitable and just.

Dated this 1st day of November, 2022

**WALCHESKE & LUZI, LLC**

s/ *Paul M. Secunda*

James A. Walcheske
Paul M. Secunda
125 S. Wacker Dr., Suite 300
Chicago, Illinois 60606
Telephone: 224-698-2630
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

*Counsel for Plaintiffs*