IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RYAN K. GOSSE and CLYDE W. DAVIES, individually and as representative of a Class of Participants and Beneficiaries of the Dover Corporation Retirement Savings Plan,<br><br>Plaintiffs,<br><br>v.<br><br>DOVER CORPORATION, *et al*.,<br><br>Defendants. | Case No. 22 C 4254<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

Ryan K. Gosse and Clyde W. Davies ("Plaintiffs") bring this putative class action individually and on behalf of participants and beneficiaries of the Dover Corporation Retirement Savings Plan ("Plan"), against Dover Corporation ("Dover") and its Compensation and Benefits Committees as well as individual members (collectively, "Defendants"). Plaintiffs assert allege that Defendants breached their fiduciary duties by paying excessive recordkeeping fees (Count I) and failing to monitor (Count II), both in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104. Before the Court is Defendants' motion to dismiss for failure to state a claim. (Dkt. 79). For the reasons discussed below, the motion is granted.

**BACKGROUND**

According to the operative complaint, Dover is a global manufacturer headquartered in Illinois that sponsors a 401(k) defined contribution plan for participants like Plaintiffs. (Sec. Am. Class Action Compl., ¶¶ 2, 4, 42, Dkt. 73). Participants direct the investment of their contributions, but the Plan selects the recordkeeper and investments. (*Id*. ¶ 4). In 2022, the Plan had approximately $1,468,437,574 in assets with 18,965 participants. (*Id*. ¶¶ 45-46).

1

Mega 401(k) plans like Dover's hire national retirement plan service providers—referred to as recordkeepers—with bundled service offerings that can meet all the needs of very large retirement plans with the same level and caliber of services for recordkeeping and administration ("RKA") services and fees. (*Id*. ¶ 48). There are three general types of RKA services provided by all plan recordkeepers: (1) Bundled RKA which may include recordkeeping, transaction processing, administrative services, participant communications, compliance support, various professional services, plan-level investment consulting and management, and trustee/custodian services; (2) "A La Carte" services with separate additional fees which typically include loan processing and maintenance, brokerage services/account maintenance, distribution services, and processing of qualified domestic relations orders; and (3) Ad Hoc fees such as transaction fees and other administrative fees for various services. (*Id*. ¶¶ 53-56). The sum of fees for Bundled RKA, A La Carte, and Ad Hoc services equals the Total RKA fees. (*Id*. ¶ 57). Plaintiffs maintain, however, that Bundled RKA fees make up most of the Plan fee charges. (*Id*. ¶ 58). In the retirement plan services industry, all else being equal, the more participants a plan has, the lower the effective per participant fee rate that recordkeepers are willing to charge. (*Id*. ¶ 50).

From the beginning of the proposed Class Period on August 11, 2016, until August 31, 2020, the sole Plan recordkeeper was Wells Fargo Bank N.A. ("Wells Fargo"). (*Id*. ¶ 5). From September 1, 2020, to the present, the sole Plan recordkeeper has been Bank of America, N.A. d/b/a Merrill Lynch ("Merrill Lynch"). (*Id*. ¶ 6). Dover sponsors the Plan but the Benefits Committee serves as Plan Administrator with fiduciary duties for day-to-day administration and operation of the Plan. (*Id*. ¶¶ 7, 44).

Plaintiffs contend that Defendants breached their fiduciary duty of prudence by incurring unreasonable RKA fees through Wells Fargo, and then, Merrill Lynch, and by failing to regularly

monitor the responsible Plan fiduciaries. (*Id*. ¶¶ 19, 20). Specifically, Plaintiffs maintain that Wells Fargo paid an 186% premium for per-participant Plan RKA fees to Wells Fargo from 2016 through 2020, and a 40% premium for per-participant Plan RKA fees to Merrill Lynch from 2021 to present. (*Id*. ¶ 21). Plaintiffs assert that Defendants should have lowered expenses by soliciting bids from competing RKA providers, and using its size and the correspondent bargaining power of the Plan to negotiate for RKA fee rebates. (*Id*. ¶ 22).

In support of these allegations, Plaintiffs rely upon data obtained from Schedule C of the 2018 Department of Labor 5500 Form filed by the Plan fiduciaries:

**2018 Form 5500 Schedule C Part 1 Line 2**

| Provider | Relationship | Direct Comp | Service Codes |
|---|---|---|---|
| WELLS FARGO BANK, N.A. | NONE | $1,809,090 | 15 Recordkeeping and information management<br>21 Trustee<br>37 Participant loan processing<br>49 Other services<br>50 Direct payment from the plan<br>60 Sub-transfer agency fees<br>62 Float revenue<br>64 Recordkeeping fees |
| TOWERS WATSON | NONE | $328,584 | 17 Consulting (pension)<br>50 Direct payment from the plan<br>70 Consulting fees |
| FINANCIAL ENGINES INC | NONE | $263,242 | 27 Investment advisory (plan)<br>51 Investment management fees paid directly by plan |
| CROWE HORWATH LLP | NONE | $59,000 | 29 Legal<br>50 Direct payment from the plan |
| ALIGHT SOLUTIONS | NONE | $37,500 | 29 Legal<br>50 Direct payment from the plan |
| HINCKLEY ALLEN & SYNDER LLP | NONE | $5,433 | 29 Legal<br>50 Direct payment from the plan |

(*Id*. ¶¶ 61-63).

They estimate Total RKA fees paid by the Plan to Wells Fargo from 2016-2020:

**Total Recordkeeping and Administration (Total RKA) Fees**

|  | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|
| Participants | 19,327 | 19,758 | 18,373 | 18,841 | 18,331 | 18,926 |
| Est. Total RKA Fees | $1,744,477 | $1,986,668 | $1,809,090 | $1,437,305 | $1,138,063 | $1,623,121 |
| Est. Total RKA Per Participant | $90 | $101 | $98 | $76 | $62 | $86 |

(*Id.* ¶ 105)

They cite the following proposed comparators:

| Plan | Service / Compensation Codes |
|---|---|
| Michelin 401(K) Savings Plan | 15, 16, 25, 37, 52 |
| FedEx Office And Print Services, Inc. 401(K) Retirement Savings Plan | 15, 25, 50, 16, 26, 52, 21, 37, 57 |
| Pilgrim's Pride Retirement Savings Plan | 64 |
| JBS 401(K) Savings Plan | 64 |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 15, 25, 26, 37, 38, 52 |
| Genesis Healthcare 401(K) Plan | 15, 21, 37, 50, 62, 64 |
| Bausch Health Companies Inc. Retirement Savings Plan | 37, 60, 64, 65 |
| Viacom 401(K) Plan | 15, 37, 50, 64 |
| Kindred 401 (K) Plan | 15, 21, 25, 28, 38, 49, 50, 52, 57, 59, 62, 64, 65 |

(*Id.* ¶ 71).

Compiling this information, Plaintiffs offer the following comparison charts based on participant numbers and asset size:

**Comparable Plans' Total RKA Fees - Form 5500 (Wells Fargo Recordkeeper)**
(Price calculations are based on 2018 Form 5500 information)

| Plan | Participants | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| Michelin 401(K) Savings Plan | 16,521 | $570,186 | $35 | Vanguard |
| FedEx Office and Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $521,754 | $30 | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $486,029 | $26 | Great-West |
| **Dover Plan 2018 Fee** | **18,373** | **$1,809,090** | **$98** | **Wells Fargo** |
| JBS 401(K) Savings Plan | 19,420 | $481,539 | $25 | Great-West |

(*Id.* ¶ 106).

**2018 ASSET-BASED TOTAL RKA FEE PLAN COMPARISON (5500 FORMS)**

| Plan | Assets | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| FedEx Office And Print Services, Inc. 401(K) Retirement Savings Plan | $770,290,165 | $521,754 | $30 | Vanguard |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | $773,795,904 | $333,038 | $31 | Vanguard |
| Bausch Health Companies Inc. Retirement Savings Plan | $904,717,349 | $249,435 | $28 | Fidelity |
| Viacom 401(K) Plan | $1,249,874,734 | $376,314 | $31 | Great-West |
| | | Average | $30 | |

(*Id.* ¶ 170).

Plaintiffs thus allege that "the total RKA fees paid by similarly-sized comparable plans provide evidence that the Total RKA fees paid by the Dover Plan for materially similar commoditized RKA services were excessive and unreasonable, and leads to a reasonable inference that Dover Plan fiduciaries employed an imprudent fiduciary process." (*Id.* ¶ 112). They further

5

assert that this "cannot be plausibly explained by immaterial service disparities described on 5500 Forms or elsewhere because there are not material differences in the Total RKA services provides to plans as large as the Dover Plan and the comparable plans." (*Id.* ¶ 146).

Plaintiffs estimate Total RKA fees paid by the Plan to Merrill Lynch from 2021-2022:

**Total Recordkeeping and Administration (Total RKA) Fees**

|  | 2021 | 2022 | Average |
|---|---|---|---|
| Participants | 18,331 | 18,856 | 18,594 |
| Est. Total RKA Fees | $641,585 | $659,960 | $650,773 |
| Est. Total RKA Per Participant | $35 | $35 | $35 |

(*Id.* ¶ 163).

They cite different proposed comparators:

**Comparable Plans' Total RKA Fees Based on Publicly Available Information from Participant Fee Disclosures or Financial Statements**

| Plan | Participants | Total RKA Fee ($) | Total RKA Fee ($/pp) | Record-keeper |
|---|---|---|---|---|
| Dollar General Corp 401(K) Savings and Retirement Plan | 16,125 | $516,000 | $32 | Voya |
| Team Health 401(k) | 17,237 | $430,925 | $25 | Schwab |
| **Dover Plan 2021 Fee** | **18,539** | **$648,865** | **$35** | **Merrill Lynch** |
| RELX Inc. US Salary Investment Plan | 19,465 | $486,625 | $25 | Empower |

(*Id.* ¶ 164).

In sum, Plaintiffs claim that "Defendants could have obtained materially similar RKA services for much less from other recordkeepers or from Wells Fargo or Merrill Lynch itself had it only leveraged its massive size." (*Id.* ¶ 177). Moreover, they allege, it can be "plausibly inferred from the unreasonably high fees it paid for RKA services during the Class Period that Defendants did not conduct an effective or competitive solicitation of bids for RKA services, and failed to take

6

actions that would have reduced such fees." (*Id.* ¶ 178). This alleged breach of duty caused millions of dollars of harm to Plaintiffs and Class Members' retirement accounts. (*Id.* ¶ 179).

## PROCEDURAL HISTORY

Plaintiff commenced this action in August 2022. (Dkt. 1). Defendants filed a motion to dismiss, (Dkt. 12), and in response Plaintiffs amended their complaint in November 2022, (Dkt. 16). Defendants moved again to dismiss under Rule 12(b)(6). (Dkt. 20). After the parties had completed briefing on the motion, the Seventh Circuit issued a precedential opinion in *Hughes v. Northwestern Univ.*, 63 F.4th 615 (7th Cir. 2023) (*Hughes II*). Plaintiffs were granted leave to submit *Hughes II* as supplemental authority, (Dkt. 44), and Defendants responded, (Dkt. 46). The Court ruled orally on the motion on July 23, 2024, dismissing the first amended complaint without prejudice and granting Plaintiffs a final opportunity to submit a viable complaint. (Dkt. 72; Hearing Tr., Dkt. 80-1). Plaintiffs' second amended class action complaint, (Dkt. 73), is the operative complaint that Defendants now urge the Court to dismiss with prejudice, (Dkt. 79).

## LEGAL STANDARD

When analyzing a Rule 12(b)(6) motion, the court must draw all reasonable inferences in a plaintiff's favor and accepts all well-pleaded facts as true. *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021). However, the court need not accept legal conclusions as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a claim must be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"In putative ERISA class actions, Rule 12(b)(6) motions are an 'important mechanism for weeding out meritless claims.'" *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (citation omitted). When reviewing these types of claims, courts must take into account the unique facts of

7

each case "[b]ecause the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022) ("*Hughes I*") (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). Whether the operative complaint survives dismissal depends on the extent to which "[P]laintiffs have pleaded sufficient facts to render it plausible that [Defendants] incurred unreasonable recordkeeping fees and failed to take actions that would have reduced such fees." *Hughes II*, 63 F.4th at 631.

## DISCUSSION

ERISA fiduciaries have a duty to act prudently when managing retirement plans. 29 U.S.C. § 1104(a)(1)(B). Relevant here, Defendants "have a continuing duty to monitor their expenses to make sure that they are not excessive with respect to the services received." *Hughes II*, 63 F.4th at 625 (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015)). As the Court explained in rejecting the prior complaint, the Seventh Circuit delineated a "newly formulated pleading standard" for analyzing violation of ERISA fiduciary duty claims. *Hughes II*, 63 F.4th at 631. "To plead a breach of the duty of prudence under ERISA, a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness." *Id.* at 630 (citing *Hughes I*, 595 U.S. at 176). "Because the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, [] courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Albert*, 47 F.4th at 570 (quoting *Hughes I*, 142 S. Ct. at 742). As such, this is a "context specific inquiry." *Hughes II*, 63 F.4th at 628. "At the pleadings stage, a plaintiff must provide enough facts to show that a prudent alternative action was plausibly available, rather than actually available." *Id.* at 630.

8

*Hughes II* was decided in March 2023 (on remand from the Supreme Court in January 2022). But a few months earlier, in August 2022, the Seventh Circuit decided *Albert*, a similar case involving claims of excessive recordkeeping fees in violation of ERISA. 47 F.4th at 570. Like the instant case, the *Albert* plaintiffs referenced publicly available data for nine other plans with similar numbers of participants and assets that appeared to have paid a much lower average recordkeeping fee per plan participant. *Id.* at 579. The *Albert* court noted that Plaintiffs had not alleged any facts as to the quality or type of recordkeeping services that the comparator plans were paying for, and instead, relied solely on the fact that a cheaper option existed. *Id.* When scrutinized using the context-sensitive approach affirmed in *Hughes I*, the *Albert* claims were deemed possible but not plausible under *Twombly* and *Iqbal*, and thus the Seventh Circuit upheld the dismissal of the complaint. *Albert*, 47 F.4th at 580.

In contrast, *Hughes II* found the ERISA breach claims sufficient. 63 F.4th at 632. Distinguishing *Albert*, the Seventh Circuit cited plaintiffs' additional allegations that recordkeeping services are fungible, the market for them is highly competitive, and $35 per participant was a reasonable recordkeeping fee based on the services provided by existing recordkeepers and the plan's features. *Hughes II*, 63 F.4th at 632. Furthermore, the *Hughes II* plaintiffs asserted that the quality or type of recordkeeping services were comparable to the comparator plans and provided examples of other universities which had lowered their recordkeeping fees through competitive bidding along with details about how the defendant university did in fact lower recordkeeping fees when it restructured its plan a few years later. *Id.* at 632. Taken together, those specific factual averments "suggest[ed] that [Defendant's] recordkeeping fees were unreasonably high and that means to lower such fees were available." *Id.*

9

The *Hughes II* court therefore held that "plaintiffs have pleaded enough to cross the line from possibility to plausibility." *Id.* at 634.

The Court previously found Plaintiffs' first amended complaint was closer to *Albert* than *Hughes II*, primarily because the facts alleged therein did not offer an apples-to-apples comparison of comparable services or plans. (Dkt. 80-1). In response, Plaintiffs filed the second amended class action complaint in which, following *Hughes II*, they assert that recordkeeping services are a commodity in a highly competitive market that is driven by price such that for mega 401K plans, Defendants could have selected significantly less expensive alternatives that would have provided the same level of service as Wells Fargo or Merrill Lynch. While on its face these allegations appear to mirror *Hughes II*, the Court agrees with Defendants that they are not premised upon meaningful benchmarks and therefore do not state a claim.

Starting with 2016-2020 when Wells Fargo was recordkeeper, as an initial matter, Plaintiffs calculated an average Total RKA fee of $86 per participant using Plan data spanning 5 years but then inexplicably presented comparator data for 1 year only, 2018. Notably, during this five-year period, the Plan's Total RKA fees ranged from a high of $101 in 2017 to a low of $62 in 2020. While it is true that Defendants were in the process of switching from Wells Fargo to Merrill Lynch in 2020, the per participant fee had been steadily decreasing—from $98 in 2018, to $76 in 2019, to $62 in 2020, to $35 by 2021. If the comparator plans were similarly trending downward between 2016 and 2020, then examining only one year of their data does not present a complete picture of the reasonable range of fees and plausible options during the relevant timeframe. Plaintiffs offer no justification for this flawed approach.

Even if the Court analyzed the 2018 data, Plaintiffs have not shown that the cited plans are actually comparable. In 2018, the Plan paid Wells Fargo a Total RKA fee of $98 per participant for

10

18,373 participants under 8 service codes—15, 21, 37, 49, 50, 60, 62, 64. Plaintiffs identify 4 comparators: (1) Michelin 401(k) savings plan paid Vanguard a Total RKA fee of $35 per participant for 16,521 participants under 5 service codes—15, 16, 25, 37, 52; (2) FedEx Office and Print Services, Inc. 401(k) plan paid Vanguard a Total RKA fee of $30 per participant for 17,652 participants under 9 service codes—15, 25, 50, 16, 26, 52, 21, 37, 57; (3) Pilgrim's Pride retirement savings plan paid Great-West a Total RKA fee of $26 per participant for 18,356 participants under 1 service code—64; and (4) JBS 401(k) savings plan paid Great-West a Total RKA fee of $25 per participant for 19,420 participants under 1 service code—64.

First, Plaintiffs have not shown that the comparator plans paid for equivalent services from these recordkeepers. Plaintiffs presume that use of service code 15 (recordkeeping and information management) or service code 64 (recordkeeping) reflects the commoditized services (i.e., bundled RKA) that they contend constitutes the bulk of the Total RKA fee. In doing so, they wholly ignore that the Plan itself paid for services under 15 *and* 64, while the 4 comparators paid for services under 15 *or* 64. In fact, the Plan paid for services under 6 other service codes in addition to 15 and 64, yet Plaintiffs assert that the Michelin 401k which paid for services under 4 other service codes in addition to 15, and the FedEx 401(k) which paid for services under 6 different service codes in addition to 15, 37, and 50 (similar to the Plan), and the Pilgrim's Pride and JBS 401(k), which paid for services under 64 only, were all receiving the same level and quality of recordkeeping services. But that conclusion is difficult to square with the Form 5500s. It is reasonable to infer that some distinction exists between the various service code categories. However, neither the operative complaint nor the Plaintiffs' response sheds light on how to interpret the comparator data selected by Plaintiffs. In short, if the underlying services are dissimilar, it follows that Plaintiffs are still comparing apples to oranges.

Plaintiffs further compound this error by disregarding that the Total RKA fee—which the operative complaint alleges is equal to the sum of bundled, a la carte, and ad-hoc services—is derived from *all* the listed service codes on Form 5500. So, for 2018, the Plan paid for Total RKA fees incurred under 8 service codes while one comparator incurred fees under 5 service codes, another comparator incurred fees under 9 service codes, and the final two comparators incurred fees under 1 service code. For example, the Plan paid over $1.8 million to Wells Fargo for recordkeeping and information management, trustee, participant loan processing, other services, direct payment from the plan, sub-transfer agency fees, float revenue, and recordkeeping fees, while JBS 401(k) paid $481,539 to Great West for recordkeeping fees. As already discussed, the majority of these service codes are not the same; thus, the basis for comparison is unclear. While it makes sense that most recordkeeping services are fungible, Plaintiff fail to present a logical framework for calculating the impact of the similarities or differences within these Form 5500s.

To be sure, the Court is not suggesting that *Hughes II* requires Plaintiffs to find plans that use the exact same service codes to demonstrate that prudent recordkeeper alternatives existed. But by presenting conclusory assumptions about how to interpret the data, as opposed to a reliable methodology that accounts for the differing levels and types of services and resulting price points, Plaintiffs continue to fall short on meeting their pleading burden.

The three additional comparators based on asset size suffer from the same shortcomings. According to their Form 5500s, Southern California Permanente Medical Group paid Vanguard a Total RKA fee of $31 per participant for 10,770 participants under 6 service codes—15, 25, 26, 37, 38, 52 (Dkt. 80-17); Bausch Health Companies Inc. paid Fidelity a Total RKA fee of $28 per participant for 8,902 participants under 4 service codes—37, 60, 64, 65 (Dkt. 80-14); and Viacom 401k paid Great-West a Total RKA fee of $31 per participant for about 12,139 participants under

12

4 service codes—15, 37, 50, 64. These plans all had significantly lower participant numbers than the Plan (a factor Plaintiffs allege is the primary driver of the effective rate offered). For that reason and all the others stated above, those comparators are equally inadequate.

Turning to 2021-2022 when Merrill Lynch was recordkeeper, Plaintiffs chose not to rely upon any of the previous comparators. Defendants correctly note that analyzing the patterns of the same mega 401k plans over the years covering the entire proposed class period would be one way to alleviate concerns about cherry-picking and manipulation of data. Indeed, Defendants assert that the 2021 Form 5500 for the Michelin 401(k) plan reflects a Total RKA fee per participant of $38, which is greater than the $35 paid by the Plan, (Defs.' Mem. at 8, Dkt. 80), a contention Plaintiffs do not specifically refute in their response. Plaintiffs reason that the recordkeeper changed and so it is fine that their comparator set did as well. Even so, unless the original mega 401k comparator plans substantially dropped in participant/asset size, it makes little sense to deem them non-comparable for the later timeframe. Unlike *Hughes II*, which involved a particular industry with standardized services across comparator plans, Plaintiffs chose to restrict their pool to larger plans that received a similar set of Total RKA services as evidenced by service codes 15 and 64 on their Form 5500s. (Pls.' Resp. at 7-8, Dkt. 83). That approach has deficiencies explained above that persist even with this new comparator data set.

This time, Plaintiffs allege lower RKA per participant fees of $32 paid to Voya by Dollar General Corp. 401(k), $25 paid for Schwab by Team Health 401(k), and $25 paid to Empower by RELX Inc. US Salary Investment Plan. However, the Court could not find a description of the specific services provided to these comparator plans or the basis for the calculation. As such, there is no way to ascertain if the services were comparable such that any higher fee paid by the Plan should be deemed excessive. Again, only well-plead allegations satisfy *Twombly* and *Iqbal*.

Moreover, Plaintiffs did not respond to Defendants' argument that the plan documents for Dollar General and Team Health (as well as some of the other 2018 comparators) indicate that the employer who sponsors those plans paid all or some of the RKA fees. (Defs.' Br. at 9-10). That would be a critical detail that Plaintiffs have not accounted for when asserting that the data shows the fees paid by Plan participants was excessive when compared to the amount paid by other plan participants.

Plaintiffs' strongest argument here is the significant drop in recordkeeping fees from 2016 to 2021. That detail, coupled with other relevant evidence, could indicate that reasonable options existed that Defendants failed to explore sooner. But without any reliable comparator data, the decrease, standing alone, is not enough to state a viable cause of action. After all, as Defendants argue, this could also show that they were acting prudently as recordkeeping fees continually decreased annually and they ultimately engaged a more cost-effective alternative in 2020.

At bottom, like *Albert*, Plaintiffs claim that Defendants violated their duty of prudence by failing to monitor the Plan, solicit competitive bids, or negotiate with recordkeeping providers and that this is demonstrated by the Plan having a higher RKA fee than other similarly sized plans. But *Hughes II* reaffirmed that "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence" and "plans may generally offer a wide range of . . . fees without breaching any fiduciary duty." 63 F.4th at 625-626. Having engaged in the context-specific scrutiny required by *Hughes II,* the Court concludes that Plaintiffs have not pleaded enough factual content "to render it plausible that [Defendants] incurred unreasonable recordkeeping fees and failed to take actions that would have reduced such fees." *Id.* at 631.

## **CONCLUSION**

For all the foregoing reasons, Defendants' motion to dismiss is granted and the second amended class action complaint is dismissed with prejudice.

**DATED**: October 24, 2025              **ENTERED**:

                                                                   _____
                                                                   LaShonda A. Hunt
                                                                   United States District Judge